# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-2061V
UNPUBLISHED

| | |
|---|---|
| FRANCISCO MARCILLO,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: April 14, 2023<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Tetanus Diphtheria<br>acellular Pertussis (Tdap) Vaccine;<br>Vasovagal Syncope |

*Alison H. Haskins*, Maglio Christopher & Toale, PA, Sarasota, FL, for Petitioner.

*Steven Santayana*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION AWARDING DAMAGES[1]

On December 30, 2020, Francisco Marcillo filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a syncopal episode after receiving a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine on March 13, 2020, which resulted in injury. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. Although entitlement was conceded, the parties could not agree on all damages components, so the matter was designated for SPU "Motions Day," and argument was heard on April 3, 2023.

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons set forth below, and as represented during the hearing,[3] I find that Petitioner is entitled to an award of damages in the amount of **$286,311.91, consisting of $30,312.03 for past unreimbursable expenses, $5,999.88 for lost wages, and $250,000.00 for actual pain and suffering.**

## I.   Relevant Procedural History

Approximately eight months after the case was filed, Respondent filed his Rule 4(c) Report in September 2021 conceding that Petitioner was entitled to compensation. Respondent's Report at 1. ECF No. 27. In view of Respondent's position, a Ruling on Entitlement was entered in Petitioner's favor. ECF No. 28. Thereafter, the parties attempted to informally resolve the issue of damages, but reached an impasse on an appropriate award. ECF No. 35. I indicated to the parties that I would resolve their dispute as to damages via a hearing, which was held on April 3, 2023.[4]

The parties argued for damages based on briefing completed prior to the motions hearing. Thus, on March 4, 2022, Petitioner filed a damages brief requesting that I award $225,000.00 for his past pain and suffering, plus $25,000.00 for his future pain and suffering. Petitioner's Damages Brief ("Brief") at 18, ECF No. 38. On March 28, 2022, Respondent filed a damages brief proposing a pain and suffering award of $125,000.00. Respondent's Damages Brief ("Opp.") at 1, ECF No. 39. Finally, on April 11, 2022, Petitioner filed his reply to Respondent's brief reaffirming his request. Petitioner's Reply Brief at 2. ECF No. 40. The parties otherwise agreed, however, that an award of $30,312.03 in compensation for Petitioner's unreimbursable expenses and $5,999.88 for Petitioner's lost wages is appropriate. There are no other damages components in contention beyond pain and suffering. ECF No. 45.

## II.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include an award "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof

---

[3] *See* Minute Entry dated April 5, 2023. The transcript of this hearing, which was not yet filed as of the date of this Decision, is hereby incorporated into this Decision by reference.

[4] *See* Hearing Order, filed March 27, 2023 (Non-PDF).

with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

### III.   Appropriate Compensation for Petitioner's Pain and Suffering

#### a.  Severity and Duration of Pain and Suffering

Pain and suffering is the sole disputed component of damages herein, so only the legal standards bearing on its calculation are relevant. In this case, awareness of the injury is not contested. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole, including the medical records and affidavit, written briefs, and argument at the April 3rd Motions Day

3

hearing. Based upon the above, I note and find the following:

- On March 13, 2020, Petitioner presented to his primary care physician, Dr. Jennifer Boudreau, for a physical examination. Ex. 1 at 5-8. The medical note documenting this appointment indicates that Petitioner's blood was drawn by Megan Wilson, a medical assistant. *Id.* at 7. Because Petitioner reported that he didn't like needles and "sometimes feels faint," he was "laid back on the table." *Id.* After the completion of this procedure, Petitioner indicated that he felt fine and "was sat up on the exam table." *Id.*

- Approximately five minutes after the completion of the blood draw, Petitioner was administered a Tdap vaccine by MA Wilson. Ex. 1 at 7-8. The medical record documents Petitioner's report of feeling "woozy." *Id.* at 7.

- Despite the medical assistant's instruction to remain seated, the medical notes reflect that Petitioner "got up from exam table and attempted to walk across exam room. Had syncopal episode . . . Found [Petitioner] laying face down." Ex. 1 at 8.

- In his affidavit, signed on February 28, 2022, Petitioner avers that when he "woke up" after suffering from his syncopal episode, "I was laying in a pool of blood on the floor and I remember seeing several of my teeth scattered around me. I had a large cut on my lip/chin and was bleeding from my nose. I knew immediately that my jaw wasn't in alignment and my entire face hurt . . .  I was really scared." Ex. 38 at 2.

- Petitioner was transported to Inova Loudon Hospital's Emergency Department by emergency medical services. Ex. 1 at 8; Ex. 6 at 6.

- Upon arrival at the hospital, it was reported that Petitioner experienced a "very brief loss of consciousness" and hit his head against a metal table. Ex. 6 at 6. The medical record categorizes Petitioner's injury as "significant" and notes bleeding from Petitioner's teeth, right jaw, and nose. *Id.* It was further noted that Petitioner had diminished ability to open his mouth actively or passively greater than "about 40%." *Id.* at 8. The laceration to Petitioner's lip was repaired with sutures and he was admitted for further assessment and treatment. Ex. 6 at 14-16, 27.

- CT scans of Petitioner's cervical spine and head were negative. Ex. 19 at 21. However, the CT scan of Petitioner's mandible and facial bones showed extensive fractures. *Id.* at 22-23.

- Petitioner states that although the doctors repaired his cuts, "they kept telling me that I had 'extensive' fracture 'deformities' involving my jaw and sinuses that would need surgery. I was terrified that my face was going to be permanently deformed. I was swollen, and black and blue, and my jaw was off-center. I couldn't open or close my mouth." Ex. 38 at 2.

- On March 14, 2020, plastic surgeon Dr. Marwan Khalifeh performed an open reduction internal fixation ("ORIF") of Petitioner's mandible, open treatment of a Lefort fracture,

4

- mandibulomaxillary fixation ("MMF"), reduction of impacted alveolar ridge/teeth from Petitioner's maxilla, debridement of Petitioner's lower lip, and lower lip tissue rearrangement. Ex. 6 at 57-58. In addition, Petitioner's jaw was wired shut. *Id.* at 31.

- In his affidavit, Petitioner stated that the wiring of his jaw left him stricken with fear and panic. Ex. 38 at 2. "I would constantly have blood and saliva pooling that I couldn't swallow but I couldn't spit it out either with the wires. They gave me a 'vacuum' to suction everything out so I could breathe and not choke. The doctors taught my wife and I how to cut the wires in case of emergency but I CONSTANTLY worried about choking to death. The fear never left me." *Id.* at 2-3(emphasis in original).

- Petitioner was discharged home on March 15, 2020 with a diagnosis of jaw fractures. Ex. 6 at 136.

- Petitioner avers that, once at home, he experienced a great deal of pain and regularly required pain medication. Ex. 38 at 3. He further states that "I had to be on a liquid diet and [my wife and I] had to figure out how to get the food inside me. I couldn't make suction for a straw and many times we had to resort to dripping the liquid from a spoon and just letting it run into my mouth. If the liquid had any spice or small fragments it was a problem. The tiny bits would block the passageways through my teeth and metal mouthpiece creating a waterfall out of my mouth. It was messy and humiliating." *Id.*

- On April 6, 2020, Petitioner presented to Inova Loudon Hospital's emergency room. Ex. 6 at 177 – 187. The medical note indicates that although Petitioner "had the wires [in his mouth] removed [four days ago]", he felt "something move in [his] mouth." *Id.* at 179. After reviewing a CT scan of Petitioner's maxillofacial bones, it was determined that "the right mandibular condyle appear[ed] to be dislocated anteriorly from the glenoid fossa and [was] moderately rotated." *Id.*

- On April 8, 2020, Dr. Mark Domanski and Dr. Khalifeh performed a second ORIF procedure of Petitioner's right mandibular condyle fracture as well as a closed reduction with internal fixation of the coronoid fracture. Ex. 11 at 2; Ex. 17 at 48. They removed some of the previously placed hardware from Petitioner's mouth. *Id.*

- In his affidavit, Petitioner states that prior to the April 8, 2020 procedure, Drs. Domanski and Khalifeh "told me there was a risk to my 'smiling' nerve and I was really anxious and concerned. The incision from the surgery was just under my right ear and it left a good scar. The wound drained constantly and just wouldn't seem to heal." Ex. 38 at 3-4.

- On April 16, 2020, Dr. Khalifeh opened Petitioner's incision to "express some hematoma and mild purulent" and pack the wound. Ex. 28 at 3. Petitioner was prescribed oxycodone and clindamycin. *Id.*

- In his affidavit, Petitioner states that he experienced "terrible bursts of pain in the salivary glands on the right side immediately prior to eating something and I would

5

sweat in the area under my right ear when I would eat. It was weird and disturbing." Ex. 38 at 4.

- Because Petitioner's s wound had still not healed, on April 22, 2020, Petitioner was prescribed a second course of antibiotics. Ex. 11 at 8.

- Petitioner underwent a third surgery on April 29, 2020. Ex. 5 at 14. The procedures included debridement and irrigation of his right facial wound and removal of the mandibular arch bar hardware from his mouth. *Id.* During surgery it was noted that Petitioner's left maxillary lateral incisor was loose. *Id.* at 15.

- In his affidavit, Petitioner states that the third surgical procedural resulted in an additional wound that became infected. Ex. 38 at 4. Petitioner avers that he experienced "constant[ ] drainage of fluid and pus from the wound. It was disgusting. My face was swollen and disfigured. I was embarrassed and felt really badly about myself." *Id.*

- Petitioner presented to Dr. Domanski on May 6, 2020. Ex. 11 at 16. The medical notes documenting this appointment indicate that Petitioner's right cheek was swollen and that his jaw "deviated to the left on opening." *Id.* Dr. Domanski discussed his intraoperative finding of a loose lateral incisor, recommended the continuation of mouth opening exercises, and encouraged Petitioner to follow up with a dentist "when [Petitioner] feels he can open his mouth well enough." *Id.*

- On May 15, 2020, Petitioner underwent a CT scan of his facial bones. Ex. 11 at 18-19. The CT showed "[e]xtensive fracture deformities involving the mandible and maxilla" with the fracture lines still evident. *Id.* at 19. The CT scan also showed a displaced screw along Petitioner's jaw as well as erosive changes involving the mandibular condyle. *Id.* The radiologist noted that these findings were suspicious for osteomyelitis or an infectious process. *Id.*

- Petitioner presented to Dr. Donald Portez, an infectious disease doctor, on May 21, 2020. Ex. 2 at 10-11. The medical note documenting this visit indicates that although Petitioner's mandibular wound had "essentially healed," he continued to experience discomfort and swelling. *Id.* at 10. Dr. Portez determined that Petitioner needed to undergo IV treatment once daily for approximately four weeks. *Id.* at 11.

- Petitioner avers in his affidavit that the IV treatment was a very frustrating process and caused problems with the use of his dominant arm. Ex. 38 at 4 -5.

- On June 3, 2020, Petitioner presented to Dr. Domanski for a follow up visit. Ex. 11 at 36. The medical notes indicate that "[Petitioner] has less swelling on his right face and pain is decreased. However he continues to have drainage from the wound." *Id.*

- Petitioner presented to Dr. Ibrahim Haron, an oral surgeon, on June 16, 2020. Ex. 21 at 1; Ex. 11 at 43. An x-ray of Petitioner's mouth showed loose screw hardware. *Id.* Moreover, Petitioner's exam revealed right cheek swelling and "R[ight] mandible

6

fistula." Ex. 21 at 1. Dr. Haron "discussed with [Petitioner] the necessity for hardware removal and infection control prior to orthognathic surgery work up." *Id.*

- Petitioner again presented to Dr. Domanski on June 17, 2020. Ex. 11 at 43. He noted that Petitioner's facial wound was no longer draining. *Id.*

- An August 14, 2020 orthodontic note indicates that Petitioner's treatment would include numerous interventions, including the removal of at least four teeth. Ex. 16 at 3. The estimated treatment time was 24 – to – 32 months. *Id.* at 4.

- Petitioner met with Dr. Sarina Dodhia at MedStar Oral and Maxillofacial Surgery at Washington Hospital Center on August 31, 2020. Ex. 19 at 6-9. Dr. Dodhia "[e]xplained that it will be a complicated process to get back to pre-morbid function of patient's maxilla and mandible and that he may be [sic] orthognathic surgery in the future once his bones have fully healed." *Id.* at 8.

- On September 4, 2020, Petitioner had a CT of his facial bones which showed significant interval progression of erosive changes to the right mandibular condylar head. Ex. 19 at 26.

- Petitioner presented to Ravi Agarwal, DDS, on September 24, 2020. Ex. 19 at 15-18. The notes documenting this appointment reflect Petitioner's report of difficulty chewing and right-sided facial pain with salivation. *Id.* at 15. Dr. Agarwal indicated that Petitioner would need total joint replacement to correct his jaw deflection and asymmetry. *Id.* at 17. He further noted that "[o]nce the right condylar neck/head is addressed and properly healed, definitive management of the jaw symmetry could be treated with right total joint replacement, left sided BSSO [bilateral sagittal split osteotomy]" and potentially a LF1 [LeFort 1] osteotomy to correct Petitioner's malocclusion." *Id.* Dr. Agarwal also recommended orthodontic treatment and extractions. *Id.*

- In his affidavit, Petitioner states his appointment with Dr. Agarwal resulted in extreme fear "not just because of the pain that [the recommended procedures] would cause[,] but also because the risks . . . included permanent numbness of my chin, lips and tongue and infection like I already had." Ex. 38 at 6.

- Braces were put on a section of Petitioner's teeth on October 7, 2020. Ex. 30 at 1.

- On October 15, 2020, Petitioner had four teeth extracted under anesthesia. Ex. 25 at 2. The clinical note documenting this procedure indicates that Petitioner had an "erupted tooth [that required] removal of bone and/or sectioning of tooth." *Id.*

- Petitioner attended several orthodontic appointments between November 6, 2020 and January 19, 2021 to adjust the wires in his mouth. Ex. 30 at 1-2.

- Petitioner returned to Dr. Agarwal on March 18, 2021. Ex. 37 at 8-9. The medical note indicates that orthodontic treatment to align and level dentition had been initiated and

7

that Petitioner's hardware would be removed once these procedures were completed. *Id.* at 9. Dr. Agarwal thought that Petitioner would still need a right temporomandibular ("TMJ") replacement, left BSSO, and LF1 procedure. *Id.* He also recommended the removal of Petitioner's wisdom teeth. *Id.*

- As of February 2022, Petitioner still had braces on his teeth. Ex. 38 at 6 Petitioner avers that although "[t]he braces have helped a little bit with chewing[,] my jaw is still misaligned and the right side of my face and jaw continue to be painful. I continue to have a very hard time sleeping because if there is pressure on either side of my face it can quickly become painful. Once the braces are removed, it is my understanding that I will need four additional surgeries including a total joint replacement." *Id.* at 6.

- Petitioner further avers that he continues to worry that he "might never fully recover . . . and that my face may always look 'off.'" Ex. 38 at 7. He further states that "[t]he scars from the prior repair and surgery alone bother me a lot, but knowing that my face is so asymmetrical affects not only how I feel about myself but how I walk through the world. It is embarrassing." *Id.*

There have only been two syncope cases adjudicated in the Program that resulted in reasoned decisions. The parties acknowledge that the first, *H.S. v. Sec'y of Health & Human Servs.*, No. 14-1057V, 2015 WL 6155891 (Fed. Cl. Spec. Mstr. Sept. 25, 2015), involves dissimilar facts. However, both Petitioner and Respondent discuss in their briefs the second reasoned syncope case, *Hietpas v. Sec'y of Health & Human Servs.*, No. 19-1702V, 2021 WL 688620 (Fed. Cl. Spec. Mstr. Jan. 5, 2021). While Petitioner argues that the injuries in *Hietpas* were far less consequential than his own, Respondent asserts the opposite. Opp. at 14.[5]

In *Hietpas*, the petitioner was awarded $140,000.00 for the pain and suffering she experienced as a result of a post-vaccination syncopal injury. That petitioner sustained a chin laceration (causing permanent scaring) and a jaw fracture, and underwent ORIF surgery two days later. Although she was noted to be healing well in the aftermath of her surgery, the *Hietpas* petitioner reported jaw pain, ear pressure, and intermittent difficulty chewing in the following months. Approximately seven months after surgery, her complaints included a clicking and popping sensation when opening her mouth. And

---

[5] Respondent also compared Petitioner's injury and course of treatment to petitioners in syncope cases involving proffered damages in the amount of $100,000.00. Opp. at 15. Although proffered amounts represent the full value of damages that Respondent, in good faith, believes should be awarded, I find these comparisons to be unpersuasive. I have previously noted that while "settled cases and proffers provide *some* evidence of the kinds of awards received overall in comparable cases," they do not reflect the kind of analysis and weighing of evidence performed by special masters in deciding disputed damages components. *Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 379420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020)(emphasis in original). This is especially true in syncope cases, where the downstream medical care that forms the basis for any damages are attributable to the indirect effect of vaccination – thus suggesting that the individual circumstances at issue in such a case are of great importance when attempting to determine damages.

despite attending seven sessions of physical therapy, she was eventually assessed with right and left TMJ displacement with reduction. Approximately one year after her injury, she was fitted with an orthopedic cast that had to be worn for 18 hours a day for a year. Based on this timeline, Petitioner's course of treatment lasted approximately two years after her syncopal episode.

The *Hietpas* case certainly provides some aid in assessing the proper measure of damages in this case – and I agree with Petitioner's contention that "his injuries . . . are more severe in every regard than those of Ms. Hietpas." Brief at 13. However, I base my ultimate determination on the specific circumstances of *this case*. As the overall record establishes, Petitioner experienced extraordinary treatment consequences as a result of his March 13, 2020 syncopal episode and fall. He underwent four surgical procedures in a seven-month period – at least four of which were complex. The incision that was created after Petitioner's second surgery had to be opened to "express[ ] . . . hematoma and mild purulent" and packed. And because this wound had not healed within an acceptable timeframe, Petitioner was prescribed a second course of antibiotics. The third surgery, which occurred around one-and-a-half months after Petitioner's syncopal episode, resulted in an infection that required Petitioner to withstand a four-week course of daily IV treatment.

In addition to surgery, Petitioner's jaw was wired shut for approximately one month. During this time, Petitioner was required to abide by a liquid diet and was forced to "vacuum" his mouth to suction out pooling blood and saliva. Braces were put on Petitioner's teeth approximately six months later.

Despite this extensive treatment history, Petitioner still has a difficult road ahead. Once Petitioner's orthodontic treatment is completed, he will be required to undergo the extraction of his wisdom teeth and hardware near his right condyle will be removed. Petitioner will then be scheduled for a total joint replacement once a mold of his jaw is taken. I find it likely that Petitioner has more than a year of treatment ahead. Based on this timeline, Petitioner's course of treatment is likely to extend over a total of at least four years.

In making my determination on an appropriate award, I have also fully considered Petitioner's sworn affidavit, which describes the pain he experienced as well as the circumstances that magnified the suffering and emotional distress he experienced as a result of his syncopal injury. Petitioner credibly recounts his feelings of fear (prior to each surgical procedure and during the one-month period when his jaw was wired shut), embarrassment (concerning his visible wounds and dependency on his wife for liquid nourishment), and ongoing shame (due to noticeable aesthetic changes to his face).

Given all of the foregoing, this case reflects circumstances in which a full award of pain and suffering at the top of the "cap" for that damages component is fair and reasonable. While the injury at issue is not on all fours with the kind of devastating neurologic harm that some vaccine injuries can be shown to produce, or the kind of lifelong deficits that some injuries cause, the degree of intrusive medical care required to ameliorate the Petitioner's health is notably high – along with the personal impacts of that treatment. It is for this reason that I do not award a separate component for future suffering: the extreme and unique circumstances of this case warrant an award that likely exceeds the statutory cap even before Petitioner's *future* pain and suffering is considered.

Accordingly, after taking into account the severity and duration of Petitioner's syncopal injury along with the personal hardships he has experienced as a result, and considering the arguments presented by both parties at the hearing, a review of the relevant caselaw and the written record, I find that $250,000.00 in total compensation for actual pain and suffering is reasonable in this case.

### b.  Award for Past Unreimbursable Expenses

Petitioner also requests $30,312.03 in past unreimbursable expenses. Brief at 18. Respondent does not dispute this sum. Opp. at 1.[6] Therefore, Petitioner is awarded this amount without adjustment.

### c.  Award for Lost Earnings

Petitioner requests $5,999.88 in lost earnings. Brief at 18. Respondent does not dispute this sum. Opp. at 1.[7] Therefore, Petitioner is awarded this amount without adjustment.

### Conclusion

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $286,311.91**, (representing $250,000.00 for Petitioner's actual pain and suffering, $30,312.03 for past unreimbursable expenses, and $5,999.88 for lost

---

[6] In his responsive brief, Respondent erroneously indicated that Petitioner requested $5,999.88 in unreimbursable medical expenses. However, in an informal communication, Respondent confirmed that the correct figure is $30,312.03. *See* Informal Communication (Remark), entered on April 14, 2023. Petitioner agrees this sum is correct.

[7] In his responsive brief, Respondent erroneously indicated that Petitioner requested $30,312.03 in lost earnings. However, in an informal communication, Respondent stated that the correct figure is $5,999.88. *See* Informal Communication (Remark), entered on April 14, 2023. Petitioner agrees this sum is correct.

earnings) **in the form of a check payable to Petitioner, Francisco Marcillo.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[8]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[8] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.